MARK WILLIS PATTERSON, BY HIS GUARDIAN AD LITEM, F. L. PAT-
TERSON, PLAINTIFF v. W. H. WEATHERSPOON, DEFENDANT

No. 7610SC171

(Filed 16 June 1976)

1. **Parent and Child § 8— child striking another with golf putter — no
   negligence of father**

   In an action for personal injury sustained by minor plaintiff
   when he was struck in the eye by a golf putter then in the hands of de-
   fendant's six-year-old son, there was no evidence to permit the jury
   to find that defendant should, by the exercise of due care, have rea-
   sonably foreseen that his child was likely to use a golf putter in such
   a manner as to cause injury and that he thereafter failed to exercise
   reasonable care to restrict or supervise the child's use thereof.

2. **Negligence § 5— golf putter no dangerous instrumentality**

   A golf putter is not a dangerous instrumentality *per se*.

3. **Parent and Child § 8— child's playmates — parent not insurer of safety**

   A parent is not an insurer of the safety of his child's playmates.

APPEAL by plaintiff from *Hobgood, Judge*. Judgment en-
tered 20 November 1975 in Superior Court, WAKE County.
Heard in the Court of Appeals 28 May 1976.

On 21 June 1970, the minor plaintiff was injured when
struck in the eye by a golf putter then in the hands of defend-
ant's six-year-old son. Plaintiff was about five years old at the
time he was injured. His left eye was surgically removed as a
result of the accident.

At the close of plaintiff's evidence, defendant moved for
a directed verdict. The motion was denied. Defendant offered
no evidence. The jury found that plaintiff was not injured by
the negligence of defendant. Plaintiff appealed assigning error
to the judge's charge to the jury. Pursuant to Rule 10(d) of
the Rules of Appellate Procedure, defendant cross-assigned as
error the failure of the trial court to grant his motion for a
directed verdict.

*Reynolds & Howard, by E. Cader Howard, for plaintiff
appellant.*

*Smith, Anderson, Blount & Mitchell, by Samuel G. Thomp-
son and Michael E. Weddington, for defendant appellee.*

VAUGHN, Judge.

We will quote all of the testimony relevant to the question of negligence.

The minor plaintiff testified as follows:

"On that day I saw Will Weatherspoon and his father, W. H. Weatherspoon, hitting golf balls in a vacant lot in the neighborhood where we all lived. It was about 7:30 in the evening and still daylight.

I rode my bicycle onto the vacant lot and Mr. Weatherspoon saw me. I knew Mr. Weatherspoon and his son, Will, and I spoke to Will and rode my bicycle over to where he was. I got off my bicycle at a point ten or fifteen feet away from Will and walked over to him. Will at that time was hitting some golf balls and Mr. Weatherspoon was on the other side of the lot about forty feet away.

I walked up to Will and stood behind him. Will swung his putter back and hit me in the left eye. I screamed and Mr. Weatherspoon ran over to me and picked me up and took me to his house which was the second house away from the vacant lot."

Defendant was called as an adverse witness for plaintiff and testified as follows:

"I am the father of W. H. Weatherspoon, Jr. who was six years old on June 21, 1970. My son and Mark Patterson had occasionally played together prior to June 21, 1970.

Prior to June 21, 1970, my son had received no golf lessons from a professional or semi-professional, but had received instruction from me. I had instructed my son only in the use of a putter because in my judgment at his then age of six he was incapable of swinging any club longer than a putter. I had on occasion been with my son to a commercial 'putt-putt' course in Raleigh and at the beach and had shown him how to tap the ball into the hole and how to hold the putter. His training and experience was limited to that of a light stroke on the ball.

On June 21, 1970, I took my son to a vacant lot near our home so that we could be together as father and son

with him putting golf balls and me chipping golf balls with a nine iron. I handed my son a putter to use. We arrived at the lot at about 7:15 p.m. and it was still daylight. Mark Patterson came on the lot after we had arrived and begun putting and chipping. My son was putting balls on a clay surface where we had prepared a little depression that resembled a golf cup so that he might tap the balls into this depression. My son had putted two or three balls before Mark arrived. I was about 25 to 30 feet away from my son when Mark arrived. My son had the putter in his hands when Mark arrived. Mark rode his bicycle onto the lot and approached us and we both spoke to him. My son was under my supervision and control the entire time that we were on the lot with Mark that day.

I had reason to believe that my son would respond to any instructions I gave him. I considered my son to be a well-behaved child and I had had no problems with his discipline and had no reason to believe that he would not respond to any directions or instructions that I gave him.

I recall that Mark Patterson sustained an injury to his left eye on June 21, 1970. I did not see the accident occur. I heard Mark scream and I ran over to him and noticed immediately that there had been a very severe injury to the left eye. . . .

I was standing about 25 or 30 feet away from the boys when the accident occurred, at approximately the same location as when Mark first arrived at the lot. I did not take the putter from my son when Mark arrived at the lot.

When I first gave my son the putter on that date I showed him where to putt, how to choke up on the putter and tap the ball into the depression in the clay. I did not give my son any specific instructions on the use of the putter after Mark arrived at the lot. The putter was an adult sized putter—about like a yardstick. I did not give Mark any instructions as to where he should stand or what he should do while my son was stroking the ball with the putter.

CROSS EXAMINATION:

Prior to June 21, 1970, my son had had numerous exposures to a golf club. I am an occasional golfer and there

were golf clubs in my home. We had watched golf on tele-
vision and on a number of occasions had putted together
at commercial 'putt-putt' type courses both in Raleigh area
and at the beach. My son was about four years old when
I first exposed him to a golf putter. My son and I had
played together on 'putt-putt' courses on a number of occa-
sions and he had also played with his grandfather. On these
occasions I had instructed my son on how to grip the club
and tap the ball into the hole. My son understood that the
kind of stroke to use with a putter was a short tapping
stroke to roll the ball to the cup.

There were other people present at the 'putt-putt'
courses at which we played.

I had further exposed my son to the use of a golf put-
ter by putting with him in our house on the carpet. We
putted into a device that would return the ball if the putt
went into the hole. We had done this on numerous occasions
and I had instructed him as to the correct method of put-
ting, including the type of stroke and grip on the club. We
normally putted a distance of seven or eight feet, using a
short tapping stroke. We had also played together on the
vacant lot prior to the date of the accident.

On June 21, 1970, we went to the lot after supper,
about 7:15 or 7:30. My son had asked if we could play
golf. We took a putter and a nine iron with us. We went
to the area where my son had putted before and I stationed
him three or four feet from the depression in the clay and
gave him two or three golf balls and again showed him
how to choke up or take a lower grip on the putter. At
that time my son was about forty-six inches tall, which
means he was about ten inches taller than the putter. I
then walked about ten yards away and began chipping some
balls.

I saw Mark ride his bicycle onto the lot and into the
general area where I and my son were and we both spoke
to him. He stopped his bicycle basically between my son
and me, somewhat closer to my son, and stood astride the
bicycle.

* * *

I was a Little League baseball coach and my son was
on my team of five and six year olds. I instructed my team,

including my son, not to sling the bat after hitting the ball and to be careful of the people around when you swing a bat.

REDIRECT EXAMINATION:

I had not coached my son in organized golf sports. I did not give my son any particular instructions regarding the use of the golf putter on June 21, 1970, nor did I give Mark Patterson any instructions as to where he should stand or what he should do while my son was playing with the putter.

When I observed my son putting that day, he was using short strokes under my instructions. Because the object of putting is to tap the ball into the hole it never occurred to me to tell my son not to swing a putter as you would another club. I had never observed him try to swing it in the times that we had played prior to that. My son was inclined to imitate me."

If defendant's motion for a directed verdict should have been allowed, any questions about errors in the charge are purely academic.

[1] We hold that there was no evidence to permit the jury to find, under the circumstances shown at trial, that defendant should, by the exercise of due care, have reasonably foreseen that his child was likely to use the golf putter in such a manner as to cause injury and that he, thereafter, failed to exercise reasonable care to restrict or supervise the child's use thereof. Defendant's motion for a directed verdict should have been allowed.

In *Lane v. Chatham*, 251 N.C. 400, 111 S.E. 2d 598, the defendant parents gave their nine-year-old son an air rifle. The rifle was entrusted to his use from Christmas until the following Thanksgiving. On that day, the child stepped from behind a tree, pointed the rifle directly at plaintiff and shot him. The shot entered plaintiff's eye causing total loss thereof. There was evidence that the mother had knowledge of the child's prior misuse of the air rifle but no evidence that the father had any such knowledge. The Supreme Court stated the applicable rule as follows:

"Where parents entrust their nine-year-old son with the possession and use of an air rifle and injury to another is

---

---

inflicted by a shot intentionally or negligently discharged therefrom by their son, the parents are liable, based on their own negligence, if under the circumstances they could and should, by the exercise of due care, have reasonably foreseen that the boy was likely to use the air rifle in such manner as to cause injury, and failed to exercise reasonable care to prohibit, restrict or supervise his further use thereof."

The Court held that the case was for the jury as to the mother but affirmed a judgment of nonsuit as to the father. The Court held that an air rifle is not a dangerous instrumentality *per se* and that, therefore, evidence that defendants gave the child the air rifle and permitted him to use it was not sufficient, standing alone, to support a finding of their liability for the child's wrongful act.

[2]   If an air rifle is not a dangerous instrumentality, *per se,* then certainly a golf putter cannot be so described. The father in *Lane v. Chatham* surely knew that his son would use the rifle in the presence of others. There was no indication that he ever attempted to control the child's use of the weapon or warn him of the possible dangers involved in the use thereof. If the defendant in that case did not have reason to foresee any danger to others arising out of their son's possession and negligent use of the rifle, we fail to see how defendant in the case before us had the duty to foresee injury to another arising out of his child's negligent use (if indeed the evidence here discloses a negligent use) of a common golf putter.

[3]   The minor plaintiff suffered a grievous injury. A parent, nevertheless, is not an insurer of the safety of his child's playmates. Injuries will occur no matter how careful the parent may be. Life is not lived in a vacuum. Children (as are adults) are injured daily by freakish occurrences arising out of the use of all kinds of instrumentalities which are not inherently dangerous. This child was hurt with a golf putter. It could just as easily have been a croquet mallet, a tennis racquet or a baseball bat, all of which are commonly used by children of all ages.

For the reasons stated, the verdict and judgment will not be disturbed.

No error.

Judges MARTIN and CLARK concur.